Good morning, Your Honors. James Andre Bowles. I represent the appellant and the plaintiff in this case, that's Dr. Mattoon. The first thing I would point out to the Court is a quote from page 9 of the order dismissing this case, and that is where Judge Hagen said that this was a close case. In fact, we don't agree with, Dr. Mattoon does not agree with Judge Hagen that this is a close case, but I think it enlightens the Court a little bit on where the card should fall in this case. The history is that Dr. Mattoon, between 1997 and 1999, had a rather severe herniation of a disc or a couple discs in his lower back. He's a doctor of chiropractic, which calls for hands-on work. He was unable to perform that work for a little less than two years. Counsel, I guess what this case, in my mind, and it boils down to, is whether when you cut away the chaff, was there probable cause? That's correct, Your Honor. And in this case, there was manufactured probable cause. That's what occurred here. This Judge Hawkins, what's the standard in terms of establishing the right to go forward at trial in the face of the qualified immunity assertion? What do you have to establish? My understanding is you have to establish either deliberate falsification or reckless disregard for the truth. Do you agree? It's deliberate or reckless, Your Honor. That's exactly correct. Okay. What's your proof that it was either? That it's either? Your Honor, it's our position, and we're quite clear on this. This was deliberate. This was not reckless. You can say deliberate for the rest of your time, but that doesn't establish what makes it deliberate. What proof did you offer to suggest that it was deliberate? Your Honor, we have statements made by four persons, Smith, Harrison, and Miller, and the Dr. Mattoon, all of which were described when we're talking about what Judge Hagan found here was that Harrison's statement, what Mr. Keogh claimed Harrison had said, was somewhat inconsistent with what actually had been said later in deposition. In Harrison's case, Keogh got her to say that she'd been treated in September 29th and 30th, 1997, and early 1998. At the deposition, she said at first, well, Mattoon didn't do it, but she's not sure. That's right. Sure. Three years later at her deposition. She's not sure. Does that show that Keogh deliberately misrepresented what Harrison said? Well, Your Honor, when you look at all four of these witnesses. Let's take Miller. Treatment was in April 1997 and September 1997, and said that Mattoon treated her. And the deposition, she said Dr. Strim treated her. Then she tried to correct that, and she said maybe Dr. Strim, but originally she did say to Keogh that Mattoon had treated her. So there she said, I'm correcting my recollection. I did tell Keogh Mattoon treated me, but now at my deposition three years later, I remember it was Dr. Strim. Does that show that Keogh was deliberately lying when he filled out the affidavit? No, I don't think so. So then we take Smith. The treatment was in September 1997 for a month, and then July and August three times. And at the deposition, Smith said, well, Mattoon checked in. He didn't lay hands on me. All right. Does that show that Keogh back in September 1997 deliberately lied about Mattoon's actions? It does, Your Honor. What Mattoon was there, he happened to come by, saw his client or, excuse me, saw his patient. It's an inconsistency, but it's an inconsistency created at a deposition three years later. Well, there's no other way we can establish these inconsistencies other than put them. Oh, sure there is. You can say, you can get the witnesses to testify. Keogh came around, and I told him that I hadn't been touched by Mattoon, but he said, look, it's important that we get Mattoon, so I'm going to say that you did tell me Mattoon touched me. They didn't say anything like that. No, they didn't, Your Honor. I'm certain that Mr. Keogh is not going to telegraph to these people what he's doing. These are longtime patients, all of whom. To answer the Justice and to Judge Hawkins' question, what is the deliberate lie? Well, Your Honor, all four of these people who made statements to Keogh, none of which were recorded. Mattoon made a statement to Keogh? He did, Your Honor. He talked to Keogh. He was spoken to twice, and he did speak to him on one occasion, and he told him that he had been to the office, did not have a job there, was not working there, was not collecting a paycheck there, and that he had been only to the office for the purpose of signing paperwork and just to visit the people with whom he worked. And also he told him that, and I'm not sure if the Court has this clear, there was Dr. Mattoon's practice at that location. While he was off, he had two other doctors. And we go back to Harrison, that's one of the things, and I think that it's not quite clear, but what happened with Harrison is she wasn't clear which of the other two doctors had treated her, because there had been, I believe, an overlap or at least they had both worked during that two-year period. But, Your Honor, when we look at this, when we consider how could Mr. Keogh be accused by four different people, and Judge Hagan says, he says somewhat inconsistent, certainly inconsistent, some inconsistency, and then Smith said that all he did was come in, check the mail, that sort of thing. So it's clearly not what Smith told Mr. Keogh. So we don't have just one inconsistency. We do not have a problem with recollection. We have someone who is, for all intent, or on the surface of it, he is a qualified investigator who takes no pain whatsoever to record anything, not a note. There's no notes produced. There's no recording produced. And there's no written statement by any of these people who all come back later, three years later, and say, no, that's not what I told them and that is not what happened. I have a position on that. What about the paperwork that was also referenced in the affidavit as to the billing of these three persons where Mattoon was described as being the treating physician? Well, Your Honor, he is the corporate head, and he came in and he signed the documents. But clearly what Keogh had at his, to be discovered, that he had, that he had heard from everyone, was that Dr. Mattoon was not the treating doctor. Now, what Mattoon, excuse me, what Keogh failed to do as a, no, I don't say competent, because I don't think he's incompetent. What he did here was designed to produce a result here, and that is the arrest of somebody who was going to make him look good. But what he did was, or what he failed to do by choice, is to find any records that shows any money trail to Dr. Mattoon. In fact, there were two other doctors working there who were being paid. There's no evidence, and he knew that, and it's clear on the record, that there was never any evidence that Dr. Mattoon had a job or was being paid. Now, we can believe that this detective who finds, allegedly finds, three competent witnesses and goes to Judge Roby Willis with it and gets a warrant was just mistaken or didn't remember well. But that was the core of this case were those three witnesses along with what Dr. Mattoon told him. Judge Hawkins, I want to follow up on the question that my colleague Judge Bea asked, and that is weren't there forms on which signed by Dr. Mattoon in which he described himself as the treating physician? No, Your Honor. What those forms were were just the standard forms that they mailed in for payment to the, what was the workman's comp carrier for the State of Nevada. What those forms were were just a standard form that had a signature line for the doctor, and in this case he signed it as head of the corporation because that's who they had come to be treated by, by that particular corporation who in fact was employing two other doctors. So the form says signature of physician or supplier. That's correct, Your Honor. That's what they said. And that's what he signed. That's correct, Your Honor. So he was either the physician or the supplier, but he didn't treat them? That's correct, Your Honor. Well, I think it's uncontroverted that he never treated any of these patients. That's not so fact. I did a little chart on this, and let's take Patricia Harrison. According to Keogh's affidavit, she said Mattoon treated her on September 29 and 30, 1997. That would have been during the period of disability, right? That's correct, Your Honor. And that's at SER 63. And then in her testimony she said that he never took over for another doctor and treated her. Then on cross-examination she says, I don't remember for sure who saw me when. I can't remember when I was seen, what exact dates I was seen, and who saw me. That's SER 746. That's correct, Your Honor. How does that make what Keogh did, however bumbling or maniacal, how does that make it deliberately false? Well, Your Honor, she indicated that she didn't know who had seen her. In Keogh's statement or his request for a warrant to Judge Willis, he said that she had been treated and that's not, in fact, what occurred. That it was uncontroverted that he had not treated her. She did not recall who had treated her. And what happened in this particular case is Keogh came up with what he needed, which was three witnesses that later stated that's not what they told him and those were not the facts. And Dr. Mattoon told him that also. And beyond that, there could not have ever been a charge issued against Dr. Mattoon because there's no evidence that he ever had a job or received any pay. And that's the information that he had.  Thank you. Thank you. Your Honors, may it please the Court. My name is Kelly Wirth. I'm with the State of Nevada Attorney General's Office. At the outset, I go back to what a professor used to always say to me.    You can't make a mistake. You can't make a silk purse out of a sow's ear. And this is what Dr. Mattoon is attempting to do in this case. And I'll demonstrate why he wasn't. Mr. Hawkins, was it the policy of the Attorney General's Office at the time of this investigation to not record, write down, or keep notes of witness interviews? Your Honor, it is my understanding at that time there was no policy in effect to record. It is my understanding that Mr. Keogh did keep notes on this. And were his notes produced in discovery? No, they weren't. I cannot be sure on that. Now, where in the record does it say he kept notes? And where are they? Perhaps I misspoke on that point. And as I recall through the, I recall him doing an actual investigative report on, and walking through the sequence, it appeared, I'm trying to recall if he affirmatively stated he kept notes, but he did break down each conversation in that one sheet that he turned in to the head of the Workers' Compensation Fraud Unit. You know, this is the problem when you don't do this. When an investigator doesn't take a written statement, doesn't take a recorded statement, and doesn't have written detailed notes, and I'm with Judge Fletcher, I couldn't find any. And it finds its way into an affidavit of probable cause, which leads to the arrest of a doctor. This would be a very simple case if there was a written or recorded statement, or even notes, that bucked up what was said, because as a result, we don't know what was said to Keough. Your Honor, I agree wholeheartedly. Had this been recorded and perhaps more notes taken, we wouldn't be here today. Any notes, counsel? But there is still competent evidence, or if not substantial evidence in this case, that shows that Dr. Mattoon cannot make a substantial showing of a false statement, reckless disregard for the truth, and or he can't show that such statements were material to the finding of probable cause under the Herbie v. Estes. And I do find it somewhat ironic... What about the documentation? If you're saying that the statements, what Keough said in his affidavit as to what the witnesses said, is not the only ground for issuing of the warrant, what about the invoices show that Mattoon did the hands-on work? Your Honor, and I don't believe we did an adequate job of pointing to the record in this point of the evidence when you excise the statements out, what was left. What was left, you had a statement of Mr. Craig Stevens, who was an icon claims adjuster at that point, who was the initial contact to Mr. Keough, who reported that he believed Dr. Mattoon had been working on patients Harrison, Miller, and Smith, and he also provided all the C4s, which reflect Dr. Mattoon's signatures, the C36s, which also reflect Dr. Mattoon's signatures. Do any of those forms affirmatively state that Dr. Mattoon was the treating physician? The form... The answer's no, isn't it? Well, when you look at the C36... Counsel, the answer to that question is either yes or no. What is it? I would say no, but, Your Honor, on form C36, there is a questionnaire that everyone undergoes when they sign that form that ICON uses to determine your eligibility, and on those forms, there are basically four questions, and I'll give you those four questions. And these four questions were all answered during the relevant time periods by Dr. Mattoon in the same manner. Could be an ER site. Okay. At ER 268 through 281... 268? 268. That is correct, Your Honor. That's the... Where's the form? There's Harrison C4, her health insurance forms, Dr. Mattoon's C36, and the copies of the endorsed checks. At ER 283... 282 through 299, that also reflects patient Miller's C4, some health insurance forms, Dr. Mattoon's C36, and the copies of the endorsed checks. And what do they say? What they say is, well, the C36s, they all say the same. Date you last worked on job, where you were injured. Dr. Mattoon wrote July 15, 1997. Can we get back to my question, Counsel? Show me where on any of these forms Dr. Mattoon said he was the treating physician. I cannot show you that. Okay. But... Then we have to assume that that's not the case and that, therefore, the written documentation standing alone would not have established probable cause. I would respectfully disagree in that I believe that there are very material representations by his signatures on these documents. So if an investigator brought to a magistrate simply the documents and said these documents establish that Mattoon treated these people during a period of time he was claiming and receiving disability benefits, boom, arrest warrant. Is that your position? That's not all he had, Your Honor. I understand that, but your argument leading into this was that, well, we don't have to rely just upon the witness statement or the alleged witness statement. We've got these written documents. Let's move on and talk a little bit about what was said and what was not said. In the affidavit, Keogh says that Harrison treated her on very specific dates, in 1997 and in early 1988, but she wasn't certain about those dates. She was treated by another doctor a couple of times, but, quote, Mattoon always finished up the treatment. But in her deposition, she says that he never took over for another doctor and he never treated her after he was injured. How do you square those two? Okay, and squaring that, I would submit that you would have to take into account what patient Harrison also submitted in her deposition, and therein the inconsistencies which Judge Hagan notes. And I can walk through what else Harrison stated on the record. At ER 742, 743, patient Harrison states that she filled out a C-4 form that she filled out sometime in September of 97. When asked who the treating doctor of Carson Valley Chiropractor on her first visit, she stated, I can't recall who the treating doctor was. ER 744. There's a difference between saying I can't recall who treated me and an inconsistency between an alleged statement saying that Mattoon treated me and a sworn deposition saying Mattoon never treated me. Isn't there? I would say given the timeframes involved, Your Honor, we can't get a positive or an affirmation from the patient from her deposition. We know what Kehoe alleges she said back then, but when you look at what she says in her deposition, is it at all an affirmative? And I rely on the Franks standard in this. The Franks standard, let me get that for you, says that there must be an affirmative, a specific affirmative showing of dishonesty by the applicant, i.e. knowledge of a plaintiff's innocence or that a witness was lying. We don't have that here. We have what Kehoe says the patient said here. We have what she said in her deposition. Why shouldn't we let a jury decide that? Well, under the test, the state of mind and even the credibility of these people and Kehoe's credibility would be up to a trier of fact. However, before you get to the trier of fact, under the Hurley test, you must make a substantial showing of a false statement or reckless disregard of the truth. And we don't get there. Well, it seems to me that there's quite a bit of evidence of statements that are incorrect. Now, does that equate with false? Perhaps. Your Honor, and maybe it's from where I'm standing, but again, I would respectfully disagree. There are inconsistent. This isn't the first time a witness may have gone sideways, and it won't be the last. I hope it's going to be the last time that your investigators don't keep contemporaneous don'ts. I believe that has been addressed, Your Honor. With that, there's a few things I'd like to point out that I saw in the brief that made, that caught my eye. At page 7 of Dr. Mattoon's opening brief, Dr. Mattoon argues that, quote, a substantial showing of deliberate falsehood or reckless disregard for truth is one that challenges the presumed validity of the Warren affidavit. In support of that proposition, he cites Snell v. Tonnell. Again, in using the Franks v. Delaware that has also relied in Snell v. Tonnell, they said there still must be a specific affirmative showing to get to that showing of dishonesty, and we don't get there, I would submit. Thank you very much. I think your time is over. Do you have something to add? I apologize. Thank you. Thank you, counsel. With that, I'd just like to submit that the district court's ruling be affirmed. Thank you. Thank you, Your Honor. I believe, and I didn't point this out when I was asked about these records, these records were commonly stamped with the signature of Dr. Mattoon, and I'm speaking of the records where we talked about his signature as the physician or the corporate head, whatever. But I believe, I know the record mentions that, that there was a stamp used, and it was in Dr. Mattoon's testimony in the excerpt of the record. I apologize. That just occurred to me, and I don't have that in my notes exactly where that's stated. But most importantly here, Your Honors, is if Judge Roby Willis had been told the truth about this case, is that these were not correct statements in his report, Judge Roby Willis never would have issued this arrest warrant, and we wouldn't be here today. And if they had been true, the first thing an officer knows is that if it is true, it's going to be in black and white or on an audio tape. And why would an officer choose not to do that? Thank you very much. Thank you, Your Honors. And that concludes our sittings for today.
judges: B. Fletcher, Hawkins, Bea